IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| Donna L. Cronin, | ) | C/A No. 3:11-471-MBS-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **ORDER AND OPINION** |
| | ) | |
| South Carolina Department of Corrections, | ) | |
| | ) | |
| Defendant. | ) | |
| ——————————————————— | ) | |

On January 31, 2011, Donna L. Cronin ("Plaintiff") filed an action in the Court of Common

Pleas for Richland County, South Carolina, against her employer, the South Carolina Department

of Corrections ("Defendant" or "SCDC"). ECF No. 1-1. In her complaint, Plaintiff asserts claims

for gender discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C.

§§ 2000e, et seq. ("Title VII"); violation of the equal protection clause of the Fourteenth Amendment

under 42 U.S.C. § 1983; and state law claims for wrongful discharge/breach of contract and

negligent supervision. *Id.* Defendant removed the action to federal district court on February 28,

2011. ECF No. 1. On March 7, 2011, Defendant filed a motion to dismiss, ECF No. 4, which the

court denied on December 7, 2011. ECF No. 14. On December 12, 2011, Defendant answered

Plaintiff's complaint. ECF No. 16. On September 24, 2012, Defendant filed a motion for summary

judgment, ECF No. 37, to which Plaintiff responded on October 27, 2012, ECF No. 41.

In accordance with 28 U.S.C. § 636(b) and Local Civil Rule 73.02 D.S.C., the matter was

referred to United States Magistrate Judge Shiva V. Hodges for pretrial handling. On May 14, 2013,

the Magistrate Judge issued a Report and Recommendation in which she recommended that the court

grant Defendant's motion for summary judgment as to Plaintiff's Title VII and § 1983 claims and

remand Plaintiff's state law claims for breach of contract/wrongful discharge and negligent supervision to state court. ECF No. 44. Plaintiff filed objections on June 20, 2013, ECF No. 28, and Defendant filed a reply on July 8, 2013, ECF No. 50.

## I. RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff, a female, was employed as an administrative assistant in Defendant's Special Investigations Unit ("SIU") beginning in February 2006. ECF No. 37-2 at 2. SIU's offices are located in a trailer adjacent to Defendant's headquarters in Columbia, South Carolina. SIU's function is to investigate criminal activity taking place within South Carolina's prison system. *Id.* When Plaintiff began her employment in SIU, there was a female employed in SIU as an investigator. *Id.* at 2-3. In December 2006, this female employee left and was replaced by a male investigator, Kim Dawsey ("Dawsey"). For the remainder of Plaintiff's employment, Plaintiff was the only female employee in SIU.

Prior to 2008, Plaintiff experienced no incidences of gender-based discrimination or harassment as an employee of Defendant. *Id.* at 5, 8. However, beginning in 2008, Plaintiff testified that Dawsey would routinely enter her office when she was not present and search through her desk, write in her appointment book, put notes on her bulletin board, and leave her desk drawers wide open. *Id.* at 18. In March 2008, when Plaintiff confronted Dawsey about this conduct, Plaintiff testified that Dawsey "just flew off the handle and called [her] 'bitch' in front of everybody and said he was tired of [her] accusing him of stuff and that he didn't need to listen to [her] anymore." *Id.* SIU chief Elbert Pearson ("Pearson"), who was present during this interaction, brought Plaintiff, who was visibly shaken, to report the incident to SCDC Division Director Debbie Barnwell ("Barnwell"). ECF No. 41-1 at 22. Plaintiff explained to Barnwell the events that transpired and Barnwell was in

2

agreement that Dawsey should not interfere with Plaintiff's work space.  *Id.* at 22-23.  Barnwell assured Plaintiff that she would speak with Dawsey and gave Plaintiff permission to leave work early that day.  *Id.* at 23.

Also in 2008, Plaintiff came to suspect that Dawsey and another male investigator, Rocky Barrett ("Barrett"), had been using the women's restroom in the SIU trailer.  *Id.* at 10.  Plaintiff testified in her deposition that Barrett and Dawsey would use the women's restroom on nights and weekends, when she was not there, and "destroy it, make it a mess, [and] leave garbage all over." *Id.* at 11.  At first,  in an effort to encourage better behavior, Plaintiff posted signs in the restroom, but when that failed, she reported the matter to Barnwell.  *Id.*  On May 14, 2008, Barnwell sent an email to the male employees of SIU which read:

> Okay guys-the ladies rest room is the LADIES REST ROOM.  The last time I looked (not really) you are all MEN.  I am having a new key issued for the Ladies rest room. Only Ladies will be using the Ladies rest room.  If you have any visitors who are ladies they will need to see Donna to get the key.  Violators will be forced to sit on the toilet with the seat up or stand on a wet floor!
>
> Need I say more?

ECF No. 37-3 at 2.  Two hours later, Barrett replied to Barnwell's email with the following message:

> I feel a great deal of disappointment from my colleagues . . .
>
> We have a boss that could possibly be dying, [a] million dollar credit card case that is blasted on the daily news, [m]yself who has been working out of another office for the last two weeks, [a]nd the Director of Investigations has to address an issue that concerns toilet etiquette.  There are 6 men and 1 woman that work in this building. Myself and Eddie who have not been here physically.  Why not create one large unisex bathroom so when the SMALL male's bathroom is occupied the other bathroom can be used by one of the 5 men???  Can we all work together to solve cases versus fight over a toilet seat???  I am aware of the [i]mportance of sanctity because I have a wife, 2 daughters, and 3 dogs all females, and a rabbit named Rosebud, who too is a female.  Being the only male, I like Dawsey, have learned to sit when using the restroom. Reading this email and seeing that physical action had

3

to take place concerning a lock is troubling to me.  However I will make sure that no one uses a toilet other than there [sic] own.

ECF No. 37-3 at 1-2.  Barrett forwarded his reply email to Plaintiff.  *Id.* at 1.  Plaintiff testified that she found Barrett's email to be degrading and believed the two male investigators viewed her complaint as a "big joke."  ECF No. 41-1 at 15-16.  Shortly thereafter, Barnwell had a lock installed on the women's restroom and gave the only key to Plaintiff.  ECF No. 41-5 at 3.

Following the restroom incident, Plaintiff testified that Dawsey and Barrett stopped communicating with her regarding work-related matters, which made it more difficult for her to perform certain administrative tasks.  ECF No. 41-1 at 18-19.  Plaintiff orally reported this behavior to SIU chief Pearson, who said he would speak with Dawsey and Barrett, but nothing changed.  *Id.* Plaintiff also testified that there were several instances in which she overheard Dawsey and Barrett in their own offices making comments that were degrading to women.  ECF No. 37-2 at 14.  Plaintiff testified that the men used words like "[b]itch" and "the C word" when discussing their wives or female SCDC officers whom they intended to investigate.  *Id.*  However, Plaintiff acknowledges that the offensive comments were not directed towards Plaintiff.  *Id.*

On May 22, 2009, Plaintiff wrote an email to Pearson and Dawsey concerning Dawsey's practice of entering Plaintiff's office and disturbing Plaintiff's belongings.  ECF No. 41-3.  In the email, Plaintiff complained that Dawsey continued to enter Plaintiff's office and interfere with her workspace.  *Id.*  Specifically, Plaintiff complained about the manner in which Dawsey added inmates to a list Plaintiff kept in her office of inmates under investigation for escape.  *Id.*  She also noted that she did not appreciate his writing in her calender book.  *Id.*  In response, Dawsey sent an email to Plaintiff in which he copied the other SIU employees.  ECF No. 41-4.  In his email, Dawsey disputed

4

Plaintiff's allegations, made vague references to Plaintiff's "personal problems," requested that an investigation be launched into Plaintiff's false allegations, and threatened to file a hostile work environment claim. *Id.* at 2.

On May 28, 2009, following Dawsey's reply email, Plaintiff filed a "Sexual Harassment/Hostile Work Environment Complaint" internally with Defendant. ECF No. 41-5. In this complaint, Plaintiff asserted that she had "encountered at least four uncomfortable situations with Investigator Kim Dawsey (Dawsey) and one with Investigator Rocky Barrett (Barrett) . . . [and] [t]hey have no regard or respect for my position and my responsibilities here within the Unit." *Id.* at 3. Plaintiff included information in the complaint concerning Dawsey's alleged interference with her work environment, their related confrontations, the specific incident involving the use of the women's restroom, and the "fowl language" overheard from the offices of Dawsey and Barrett. *Id.* at 3-4. In a letter dated June 22, 2009,[1] Corrie A. Unthank ("Unthank"), a human resources employee, informed Plaintiff that her allegations "do not appear to constitute sexual harassment or hostile work environment as defined under Title VII." ECF No. 41-6. However, Unthank noted that a copy of Plaintiff's complaint was given to "Mr. Murphy and Ms. Barnwell for review . . . to address [Plaintiff's] concerns as soon as possible." *Id.*

In the early morning of February 19, 2010, Dawsey kicked in the door of his own office because he had purportedly locked his keys inside. ECF No. 41-7 at 2. When Plaintiff arrived at work that morning, she noticed that Dawsey's office door was broken and that someone had installed a "hasp lock" to secure the office. Plaintiff was unsure why the door was broken but did not report

---

[1]    The Court notes that the letter itself is dated June 22, 2008. ECF No. 41-6. However, based on the May 28, 2009 filing date of Plaintiff's complaint, the Court recognizes that the appropriate date for the letter is June 22, 2009.

the issue.  However, another employee reported the issue that same morning, which prompted

Barnwell to send an email to Dawsey directing him to remove the hasp lock from his office door.

*Id.* at 3.  In response to Barnwell's email, Dawsey sent an email expressing the following

frustrations:

> Again it saddens me to have to even write this . . . the Hasp and lock on door is
> because the <u>door lock is dysfunctional</u> . . . [i]n the recent night workings according
> to agreement to work in the evening to not come into contact or limited contact with
> Ms. Cronnin [sic], an <u>issue still unresolved</u>.
>
> . . .
>
> The back stabbing, petty incompetent person that works within this division that
> reported this to you (I suppose it's one your as you before [sic] "little birds"[)] will
> have their day and I only hope I'll be there to see them fall on their face. . . . I have
> been in this business a long time and whoever this person is better have their ducks
> in [sic] row cause this can be a two way street. This is not to be construed as a threat
> but I will follow the rules legally per SCDC policy in my pursuit to identify and take
> what ever action necessary to face my accuser.
>
> . . .
>
> The hasp will not be removed till the door can be properly secured or replaced feel
> free to have your little bird push it off its cosmetic anyway. Acting Supervisor
> Pearson has the extra key . . . if you don't want to damage door frame with the half
> inch screws that secure the hasps that's up to you.

ECF No. 41-7 at 2-3.

Plaintiff was not copied on Dawsey's email but learned of the email three days later on

February 22, 2010.  ECF No. 41-1 at 35.  Plaintiff testified that the email scared her and she felt

Dawsey had become a "loose cannon."  *Id.* at 34.  Plaintiff brought her concerns to Unthank in

human resources, who then took Plaintiff to speak with Roger Peterson ("Peterson"), the head of

human resources.  *Id.* at 39.  Peterson instructed Plaintiff that, for her own safety, she leave work

early.  *Id.* at 40. Before leaving, Plaintiff returned to her office to collect her belongings, where she

observed Dawsey walking around the SIU trailer with a gun tucked into the back of his pants, which was not permitted under Defendant's policies.  *Id.* at 40.

Plaintiff returned to work the following day, Tuesday, February 23, 2010.  However, according to her deposition testimony, she could only sit at her desk "literally shaking" and was too afraid to leave her office until Dawsey left for the day.  *Id.* at 40-41.  Plaintiff had no interaction with Dawsey that day.  *Id.*  On Wednesday, February 24, 2010, Plaintiff stayed home from work, as she was waiting for someone to contact her regarding the situation with Dawsey.  *Id.* at 41.  From home, Plaintiff contacted Unthank who informed Plaintiff that she and Peterson met with two lawyers for Defendant and determined that the appropriate course of action was to ask Dawsey to take a medical leave of absence and submit to a medical evaluation before being cleared to return to work.  *Id.* at 41-42.  Plaintiff did not want to be in the office when Dawsey was placed on such leave and requested that she be kept informed as to when that would take place.  *Id.* at 42.  On Thursday, February 25, 2010, Plaintiff returned to work.  *Id.*  Plaintiff had no interaction with Dawsey that day but, according to her deposition, "felt very uncomfortable being there" and "didn't like being there." *Id.*

On Tuesday, March 2, 2010, Plaintiff received a phone call around 10:00 a.m. from Unthank informing Plaintiff that Unthank was preparing to meet with Dawsey in order to place him on medical leave and allowing Plaintiff to leave for the remainder of the day.  *Id.* at 45.  In a letter dated March 2, 2010, Defendant's Inspector General, Daniel Murphy ("Murphy"), informed Dawsey that he was being placed on medical leave for at least one week and would only be able to return to work upon producing medical documentation indicating the necessary competence and emotional fitness to return to duty as an investigator.  ECF No. 41-11 at 3.  To support this decision, Murphy noted

that he had "received reports of [Dawsey's] behavior that give [him] cause for concern," including Dawsey "continually question[ing] authority, send[ing] lengthy inappropriate emails to staff laced with anger and paranoia that include[ ] veiled threats . . . [and] destroy[ing] [his] office door when breaking into [sic] in order to retrieve [his] keys." *Id.*

On Monday, March 8, 2010, Plaintiff arrived at work and learned that Dawsey had been permitted to return to work the previous Friday, March 5, 2010, three days after Murphy had notified Dawsey that he would be required to take a leave of absence. ECF No. 41-1 at 46-47. Plaintiff also noticed that Dawsey had entered her office and written on her appointment calender. *Id.* at 46. However, no one had contacted Plaintiff to inform her of Dawsey's return. *Id.*

Following Dawsey's return, Plaintiff "felt uneasy" and on Wednesday, March 10, 2010, sent an email to Barnwell conveying Plaintiff's concerns about continuing to work with Dawsey and noting that if her concerns were not addressed, she would be forced to resign. *Id.* at 46-47. Barnwell replied that things would get better when SIU hired a new branch chief, but Plaintiff testified that this "did not make [her] feel any better." *Id.* at 47. Accordingly, on March 16, 2010, Plaintiff submitted her letter of resignation to Defendant, indicating that after "tr[ying] to seek help after two separate incidents and to no avail . . . the matter of Investigator Dawsey has made it impossible for [her] to come to work, do [her] job and feel safe." ECF No. 41-9.

## II. STANDARD OF REVIEW

### A. *Summary Judgment Standard*

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). The party seeking summary judgment bears the burden of initially coming forward and

demonstrating an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party then must affirmatively demonstrate that there exists a genuine issue of material fact requiring trial. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 250 (1986).

**B.  *Magistrate Judge's Report and Recommendation***

The Magistrate Judge makes only a recommendation to this court. The recommendation has no presumptive weight. The responsibility for making a final determination remains with this court. *Mathews v. Weber*, 423 U.S. 261, 270 (1976). The court is charged with making a de novo determination of any portions of the Report and Recommendation to which a specific objection is made. The court may accept, reject, or modify, in whole or in part, the recommendation made by the Magistrate Judge or may recommit the matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

### III. DISCUSSION

**A.  *Gender Discrimination***

Plaintiff claims that Defendant discriminated against her in violation of Title VII by failing to take steps to protect her from the gender-motivated harassment of male co-workers and effectively leaving her with no choice but to resign. ECF No. 1-1 at 10. In that regard, Plaintiff claims "[Defendant] purposefully showed preferential treatment to a male employee to the detriment of a female employee." ECF No. 41 at 23. As a threshold matter, the court notes that although Plaintiff asserts one claim for a violation of Title VII under the label of "gender discrimination," embedded

within Plaintiff's "gender discrimination" claim are potentially two distinct theories of recovery under Title VII: (1) hostile work environment resulting in constructive discharge, and (2) disparate treatment. As such, the court will outline the legal standards applicable to both potential theories of recovery.

**1. *Legal Standard***

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ." 42 U.S.C. § 2000e–2(a)(1). A plaintiff can establish claims of discrimination under Title VII in one of two ways, either by directly showing that discrimination motivated the employment decision, or, as is more common, by relying on the indirect, burden-shifting method set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). Where there is direct evidence of discrimination, the McDonnell Douglas burden-shifting framework does not apply. *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985).

However, if a plaintiff cannot present direct evidence of discrimination, he can proceed using the McDonnell Douglas method of proof. Pursuant to this burden-shifting framework, once the plaintiff establishes a prima facie case of discrimination, the burden shifts to the defendant to produce evidence of a legitimate, nondiscriminatory reason for its employment action. *Merritt v. Old Dominion Freight*, 601 F.3d 289, 294 (4th Cir. 2010). If the defendant meets the burden to demonstrate a legitimate, nondiscriminatory reason for its employment action, the burden shifts back to the plaintiff to demonstrate, by a preponderance of the evidence, that the proffered reason was

"not its true reason[], but [was] a pretext." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

   a.   *Hostile Work Environment Resulting in Constructive Discharge*

Title VII is violated "when the workplace is permeated with [sex-based] intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Howard v. Winter*, 446 F.3d 559, 565 (4th Cir. 2006) (internal quotations omitted). Such harassment in the workplace need not culminate in a tangible employment action, such as a demotion, termination, or pay cut, to state an actionable claim for hostile work environment under Title VII. *See Vance v. Ball State Univ.*, 133 S. Ct. 2434 (2013) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65–66 (1986)). Instead, when the workplace harassment or hostility leaves the victim with no other choice but to resign, the Supreme Court has recognized a variant of the hostile work environment claim known as "[a] hostile-environment constructive discharge claim." *Pennsylvania State Police v. Suders,* 542 U.S. 129, 147 (2004). A showing of a hostile work environment "is a necessary predicate" to establishing a hostile-environment constructive discharge claim *Id.* at 149. As such, a hostile-environment constructive discharge claim encompasses elements of a hostile work environment claim as well as elements of a constructive discharge claim. In that regard, the court will first articulate the legal standards relevant to claims for hostile work environment and constructive discharge and will then address the interplay between the two in the context of a hostile-environment constructive discharge claim.

To state a prima facie case of a hostile work environment based on gender, a plaintiff must demonstrate that: (1) she experienced unwelcome harassment; (2) the harassment was based on her gender; (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment

and create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer. *Chao v. Rivendell Woods, Inc.*, 415 F.3d 342, 347 (4th Cir. 2005); *White v. BFI Waste Servs., LLC*, 375 F.3d 288, 297 (4th Cir. 2004); *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003). To satisfy the causation requirement imposed in the second element, a plaintiff must show that "but for" her gender, she would not have been a victim of the alleged harassment. *See Causey v. Balog*, 162 F.3d 795, 801 (4th Cir. 1998).

Further, to satisfy the third element, a plaintiff must show "both subjective and objective components." *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 333 (4th Cir. 2003). First, a plaintiff must show that she "subjectively perceive[d] the environment to be abusive." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22 (1993). Second, a plaintiff must demonstrate that the conduct was such that "a reasonable person in the plaintiff's position" would have found the environment objectively hostile or abusive. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81–82 (1998). When analyzing the third element, courts examine the totality of the circumstances, considering such factors as the frequency of the discriminatory conduct, the severity of the conduct, whether the conduct is physically threatening or humiliating or a mere offensive utterance, and whether the conduct unreasonably interferes with an employee's work performance. *See Harris*, 510 U.S. at 23; *Hopkins v. Baltimore Gas & Elec. Co.*, 77 F.3d 745, 753 (4th Cir. 1996); *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315–16 (4th Cir. 2008) (noting that incidents that would objectively give rise to bruised or wounded feelings or complaints but are premised on nothing more than rude treatment, callous behavior, or a routine difference of opinion and personality conflict will not satisfy the severe or pervasive standard necessary to state a hostile work environment claim).

With regard to a claim for constructive discharge, an employee is entitled to relief absent a formal discharge "if an employer deliberately makes the working conditions intolerable in an effort to induce the employee to quit." *Honor v. Booz–Allen & Hamilton, Inc.*, 383 F.3d 180, 186–87 (4th Cir. 2004) (internal quotations omitted). In that regard, to demonstrate constructive discharge, a plaintiff must allege "(1) that the employer's actions were deliberate, and (2) that the working conditions were intolerable." *Heiko v. Colombo Sav. Bank, F.S.B.*, 434 F.3d 249, 262 (4th Cir. 2006). The factual inquiry in a constructive discharge claim focuses on the objective behavior of the employer and not the subjective state of the employee. *See Honor*, 383 F.3d at 187 n.2 ("[T]he law does not permit an employee's subjective perceptions to govern a claim of constructive discharge. Every job has its frustrations, challenges and disappointments; these inhere in the nature of work. An employee is protected from a calculated effort to pressure him into resignation through the imposition of unreasonably harsh conditions, in excess of those faced by his co-workers. He is not, however, guaranteed a working environment free of stress.").

In the context of a constructive discharge claim, deliberateness may be established by "actual or circumstantial evidence, including evidence of actions that single out a plaintiff for differential treatment." *Carter v. Ball*, 33 F.3d 450, 459 (4th Cir. 1994) (internal quotations omitted); *see also Martin v. Cavalier Hotel Corp.*, 48 F.3d 1343, 1354 (4th Cir. 1995) ("[E]vidence that the employer failed to act in the face of known intolerable conditions and did not treat all employees identically may create an inference that the employer was attempting to force the plaintiff to resign.") (internal quotations omitted). With regard to the second element of a constructive discharge claim, that is, that the working conditions were intolerable, "[w]hether an employment environment is intolerable is determined from the objective perspective of a reasonable person." *Heiko*, 434 F.3d at 262.

Generally, "mere dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign." *Id.* (internal quotations omitted).

With the legal standards pertaining to claims for hostile work environment and constructive discharge outlined, the court will now consider the appropriate legal standard for a "hostile-environment constructive discharge" claim as is being advanced by Plaintiff. The Supreme Court has recognized that while a showing of a hostile work environment is a necessary predicate to such a claim, a hostile-environment constructive discharge claim "entails something more" than a hostile work environment claim. *Pennsylvania State Police,* 542 U.S. at 147. Indeed, "[a] Plaintiff who advances such a compound claim must show working conditions so intolerable that a reasonable person would have felt compelled to resign." *Id.* In other words, the harassment shown must be more than severe or pervasive, as is necessary for a hostile work environment claim. *Id.* at 133. Instead, the harassment shown must be so intolerable that an employee's "resignation qualifie[s] as a fitting response." *Id.*

### b. Disparate Treatment

To establish a prima facie case of disparate treatment, a plaintiff must show: "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." *Coleman v. Md. Ct. of App.*, 626 F.3d 187, 190 (4th Cir. 2010). Constructive discharge is recognized as a type of adverse employment action in the context of a disparate treatment claim under Title VII. *See Boone v. Goldin*, 178 F.3d 253, 255–56 (4th Cir. 1999).

14

## 2. *Magistrate Judge's Report and Recommendation*

The Magistrate Judge analyzed Plaintiff's claim as one of gender-based disparate treatment. After stating the elements of a prima facie case of disparate treatment, the Magistrate Judge noted that no dispute exists as to the first two elements, as Plaintiff, being female, is a member of a protected class and at the time of Plaintiff's resignation, she had been performing her job satisfactorily. ECF No. 44 at 7. The Magistrate Judge then evaluated whether Plaintiff has presented sufficient evidence to support a finding that Plaintiff's resignation amounts to a constructive discharge. Next, to the extent that Plaintiff presented sufficient evidence to support a finding of constructive discharge, the Magistrate Judge evaluated whether Defendant's conduct was motivated by gender animus.

With regard to constructive discharge, the Magistrate Judge found that "Plaintiff has not produced evidence that Defendant failed to act in a deliberate manner to induce her to resign." *Id.* at 9. More specifically, the Magistrate Judge found that the record shows Defendant was consistently responsive to Plaintiff's complaints. *Id.* To support this conclusion, the Magistrate Judge referred to the incident on March 27, 2008, in which Plaintiff confronted Dawsey about interfering with her personal workspace and Dawsey called her a "bitch." *Id.* After that incident, Plaintiff was permitted to leave work early and stay home the following day in order to regroup. *Id.* In another instance, after Plaintiff complained about Dawsey and Barrett's alleged use of the women's restroom, Barnwell addressed the issue with Dawsey and Barrett and had a lock installed on the women's restroom. *Id.* Further, the Magistrate Judge noted that when Dawsey kicked in his office door, causing Plaintiff to fear for her safety, Defendant allowed Plaintiff to leave work early and stay home from work when she expressed discomfort with Dawsey's presence. *Id.* Additionally,

the incident with the office door culminated in Defendant's requiring Dawsey to take a medical leave of absence. *Id.* Cumulatively, the Magistrate Judge found that these instances "demonstrate that Defendant was responsive to Plaintiff's complaints and sought ways to ameliorate the situation caused by her co-worker." *Id.*

The Magistrate Judge also found that Plaintiff's working conditions were not "objectively intolerable" such that she was forced to resign. *Id.* at 10. In so finding, the Magistrate Judge cited to evidence that Defendant was responsive to Plaintiff's workplace concerns. *Id.* Further, the Magistrate Judge found that Dawsey's use of the word "bitch" on one occasion, coupled with his entries into Plaintiff's office without permission, did not constitute conduct sufficient to make the workplace objectively intolerable. *Id.* The Magistrate Judge observed that such conduct "is underscored by the fact that Plaintiff did not resign until March 2010 despite these incidents, which she alleges took place in 2008 and May 2009." *Id.* Further, to the extent the workplace became intolerable due to Dawsey's February 2010 behavior, the Magistrate Judge did not find that this conduct was directed towards Plaintiff, or that Plaintiff faced harsh conditions in excess of those faced by her coworkers. *Id.* In that regard, the Magistrate Judge found that "[a]s Plaintiff has not proved that she faced conditions in excess of her coworkers that forced her to resign from her job, she has not shown that she was constructively discharged." *Id.*

With regard to whether Defendant's conduct was motivated by gender animus, even if Plaintiff had met her burden of showing constructive discharge, the Magistrate Judge found that "Plaintiff has not set forth any evidence that Dawsey's conduct after May 2009 was related to her gender." *Id.* at 12. While the Magistrate Judge recognized that evidence indicates "Dawsey and Plaintiff do not appear to have worked well together," the Magistrate Judge concluded that "there

16

is no evidence that this was because of Plaintiff's gender." *Id.* In that regard, the Magistrate Judge

noted that "the emails attached as evidence by Plaintiff display Dawsey's propensity to insult male

and female employees, supervisors and coworkers alike." *Id.* In addition, the Magistrate Judge

pointed out that Dawsey's erratic and violent behavior was detrimental to the working environment

of both male and female SIU employees. *Id.* As such, the Magistrate Judge found that "Plaintiff has

failed to show . . . that the post-May 2009 conduct complained of was based on her gender." *Id.*

Accordingly, the Magistrate Judge recommended that Defendant's motion for summary

judgment be granted as to Plaintiff's claim of gender discrimination under Title VII.

**3.  *Plaintiff's Objections to the Magistrate Judge's Report and Recommendation***

Plaintiff objects to the Magistrate Judge's determination that she failed to produce sufficient

evidence to support a finding of constructive discharge. To support this objection, Plaintiff clarifies

that she "does not contend that Defendant took no action whatsoever in response to her complaints,

but instead that it made only superficial attempts to curb Dawsey's misconduct, while never seriously

contemplating any material action to prevent him from threatening and abusing her." ECF No. 48

at 2. Plaintiff contends that "the deliberateness of [Defendant's] conduct is found in the on-going

stream of incidents in which Plaintiff was harassed or terrorized by Dawsey, she would complain,

but Defendant would take no action to protect her." *Id.* at 3. To support a showing of deliberateness,

Plaintiff set forth the following list summarizing various instances of harassment:

> 1) Plaintiff complained about Dawsey and another male SIU investigator leaving the
> women's restroom a mess. A lock was placed on the door to the women's room.
> [ECF No. 41 at 10];
>
> 2) Dawsey and the same male SIU officer would refer to women in derogatory terms
> using language such as "[b]itch, the C word". [*id.*];

3) Dawsey would go into Plaintiff's office when she wasn't there, leaving notes, riffling through her drawers, and leaving her door unlocked even though he knew her office was cleaned by SCDC inmates. When Plaintiff tried to talk to Dawsey about this practice he moved to within inches of her face and screamed and cursed her. Plaintiff was shaken and went home early, but the only response from SCDC was from the SIU supervisor, who indicated he would speak to Dawsey about his conduct. [*id.* at 10-11];

4) In February 2010, Dawsey kicked in the door to his office. This was reported to SCDC management and Dawsey became irate. On February 19, 2010 he sent a long, angry, and sarcastic email to SCDC managers and SIU investigators in which he specifically mentioned Plaintiff. A copy of the email was forwarded to Plaintiff and she went to discuss the matter with an employee in SCDC's human resources . . . department and was told to go home for the rest of the day. When she stopped back by the SIU office to obtain her purse, she found that Dawsey was carrying a pistol in the back of his pants, an action which had so scared SIU Agent Larry Estes that he put his pistol on. [*id.* at 11-15];

5) After this incident, Plaintiff told SCDC management that she [sic] working around Dawsey terrified her. She was told that Dawsey would be put on medical leave and would have to present a letter from a doctor before he'd be allowed to return to work. Although he was supposed to be out for a couple of weeks, Dawsey returned to work within three days. [*id.* at 15-17]; and,

6) Plaintiff told SCDC management that she could not continue to work in an environment in which she was constantly afraid of being physically attacked by a co-worker. She was basically told that things would get better when a new SIU branch chief was hired. Plaintiff said that she felt that she would have to quit if no real action was taken. When nothing happened, Plaintiff resigned. [*id.* at 17-18].

ECF No. 48 at 2-3.

Based on these alleged incidents and Defendant's reaction to such incidents, Plaintiff asserts that she was "victimized" and Defendant effectively "took no action to protect her." *Id.* at 3. Instead, Plaintiff contends that after informing Defendant that she could no longer continue working with Dawsey, Defendant "continued to support the male Dawsey, rather than provide relief to the victimized, female Plaintiff." *Id.* Plaintiff contends that this action evidences that "[Defendant]

made a clear, deliberate choice to support Dawsey even though it was clear this action would force Plaintiff to quit." *Id.* at 3-4.

Plaintiff also objects to the Magistrate Judge's conclusion that Plaintiff's working conditions were not objectively intolerable. *Id.* at 4. Plaintiff's principal claim is that it was error for the Magistrate Judge to conclude that, because Dawsey's unprofessional conduct in February 2010 did not provoke the resignation of other employees, the working conditions could not have been objectively intolerable. *Id.* Plaintiff argues that reasoning is flawed because it evaluates the impact of what happened in February 2010 without regard to the prior years of abuse Dawsey inflicted on Plaintiff. *Id.* Plaintiff also argues that Defendant's decision to place Dawsey on medical leave supports her claim that the work environment was objectively intolerable. *Id.* at 5.

Finally, Plaintiff objects to the Magistrate Judge's conclusion that Defendant's conduct was not motivated by gender animus. In support of this objection, Plaintiff claims that the evidence shows that on numerous occasions, she reported Dawsey's misconduct and Defendant took no material action "to halt Dawsey's unprofessional and dangerous conduct." *Id.* at 8. In that regard, Plaintiff argues that "the actionable gender discrimination in this case is therefore found in [Defendant's] on-going refusal to take any real action to assist Plaintiff." *Id.* Further, Plaintiff argues that Defendant's willingness to ignore Dawsey's conduct, thereby "favor[ing] an at-fault male employee over a victimized female employee," proves that Plaintiff was the victim of gender discrimination. *Id.*

### 4. *The Court's Review and Analysis*

Upon careful review of the record, the court concurs with the Magistrate Judge's recommendation but differs somewhat in its analysis. The court will analyze Plaintiff's claim of

gender discrimination first as a claim of hostile-environment constrictive discharge and second as a claim of gender-based disparate treatment.

a. *Hostile Work Environment Resulting in Constructive Discharge*

The court finds that Plaintiff cannot sustain a hostile-environment constructive discharge claim because she has failed to establish a prima facie case of the predicate claim of a hostile work environment. Although Plaintiff has established the first element, that the alleged harassment she experienced at Defendant's workplace was unwelcome, the record does not contain evidence sufficient to support a finding of the remaining three elements necessary to satisfy the predicate claim for hostile work environment. Each of these remaining three elements will be addressed in turn.

i. *Whether the Harassment Was Motivated by Plaintiff's Gender*

With regard to the second element necessary to establish a hostile work environment, the court finds that Plaintiff's evidence does not support a finding that the alleged harassment was motivated by Plaintiff's gender. While Plaintiff may have been particularly affected by Dawsey's conduct, a significant portion of the conduct described in Plaintiff's deposition testimony was directed towards both male and female employees and generally detrimental to the professional environment for all SIU employees, regardless of gender. *See Lack v. Wal-Mart Stores, Inc.*, 240 F.3d 255, 260-61 (4th Cir. 2001) (recognizing evidence that both male and female employees were affected by harassment in the workplace undermines an inference of discrimination). For example, prior to Dawsey's assault on his office door, Plaintiff's deposition testimony indicates that Dawsey was involved in another incident in which he pulled a whiteboard off of a wall in the conference room. ECF No. 41-1 at 38. While Plaintiff was not present during the incident, a male employee,

SIU Agent Larry Estes ("Estes"), was present. *Id.* Similarly, Plaintiff was not present in February of 2010 when Dawsey kicked in the door of his office, and Plaintiff was not the only employee affected by this conduct. According to Plaintiff's deposition testimony, Estes expressed to Plaintiff that he was a "little scared" following the door incident. *Id.* at 37. Further, in Plaintiff's "Sexual Harassment/Hostile Work Environment Complaint," Plaintiff acknowledges that Dawsey's behavior evidenced a "lack of respect" for "his co-workers including his past supervisor . . . along with the current acting Branch Chief." ECF No. 41-5 at 3. This statement further supports a conclusion that both male and female employees were affected by Dawsey's behavior.

In addition to instances in which both male and female employees were affected, Plaintiff contends that she was harassed because of her gender based on the conflict surrounding the use of the women's restroom. While the court acknowledges that Barrett and Dawsey may have been messy, reckless, and even disrespectful in their use of the women's restroom, the court recognizes that beyond the fact that the restroom was designated for "women," Plaintiff has not provided sufficient evidence to indicate that such conduct was motivated by Plaintiff's gender. Moreover, the evidence does not suggest that the men used the women's restroom for the purpose of harassing Plaintiff because of her gender. Instead, the evidence indicates that Dawsey and Barrett may have used the women's restroom in those instances when the men's restroom was occupied. As noted herein above, Barrett's May 14, 2008 email concerning the restroom incident contains a statement proposing the creation of "one large unisex bathroom so when the SMALL male's bathroom is occupied the other bathroom can be used by one of the 5 [male employees]." ECF No. 41-2, at 2. While the court recognizes that Barrett's email also contains a gender-specific statement noting that Barrett has "learned to sit when using the restroom" due to living with a wife and three daughters,

the email goes on to state that Barrett would make sure that no one "uses a toilet other than there [sic] own." *Id.* Viewed in the light most favorable to Plaintiff, the restroom incident may have given rise to an uncomfortable discussion about appropriate restroom etiquette for members of the opposite sex, but that alone does not show that Plaintiff was treated with greater hostility because she is a woman. *See Oncale*, 523 U.S. at 80 ("Whatever evidentiary route the plaintiff chooses to follow, he or she must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted discrimination . . . because of . . . sex.") (internal quotations and citations omitted).

Finally, with respect to evidence that Dawsey called Plaintiff a "bitch" after she confronted him about interfering with her workspace, the court does not find that this statement provides sufficient evidence of discriminatory animus. The court recognizes that Dawsey's statement was unprofessional and that his use of an offensive term carrying a sexual connotation was insensitive. Nevertheless, "there is a significant distinction between harassment that is sexual in content and harassment that is sexually motivated, and Title VII is only concerned with the latter." *English v. Pohanka of Chantilly, Inc.*, 190 F. Supp. 2d 833, 840 (E.D. Va. 2002) (citing *Oncale*, 523 U.S. at 80). Dawsey's use of a sexually-charged term on one occasion to communicate his anger towards Plaintiff does not indicate that his harassment of Plaintiff was because of Plaintiff's sex. Further, while Plaintiff's deposition testimony indicates that she overheard Dawsey and Barrett using derogatory language during conversations that took place inside their own offices, those conversations were never directed at Plaintiff. *See White v. Fed. Express Corp.*, 939 F.2d 157, 160 (4th Cir. 1991) (recognizing that the plaintiff's race-based hostile work environment claim could not rest on racist incidents not directed at the plaintiff).

22

The Court finds that Plaintiff has failed to produce sufficient evidence that the alleged harassment was because of Plaintiff's gender.

ii. *Whether the Harassment was Sufficiently Severe or Pervasive*

Even assuming, *arguendo*, that Plaintiff has shown she was subjected to harassment because of her gender, Plaintiff must also show that such harassment was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive atmosphere. The court finds that the six examples Plaintiff enumerates in her objections do not support a finding that the alleged harassment was severe or pervasive. To begin, examples four, five, and six involve inappropriate conduct harmful to the work environment generally but, as previously discussed, not specifically directed at Plaintiff. Despite Plaintiff's experiencing more discomfort due to such conduct than her co-workers, Plaintiff's reaction alone is not indicative of severe or pervasive conduct. *EEOC v. Fairbrook Med. Clinic, P.A.*, 609 F.3d 320, 328 (4th Cir. 2010) (explaining that the objective prong of the test "is designed to disfavor claims based on an individual plaintiff's hyper-sensitivity").

Further, with respect to Dawsey's alleged use of sexually offensive language in the workplace, the isolated instance in which such language was directed at Plaintiff occurred two years prior to Plaintiff's resignation and is not sufficient to show severe or pervasive conduct. *See Belton v. City of Charlotte,* 175 F. App'x 641, 657 (4th Cir. 2006) ("As odious as these [racial slurs] were, however, they were isolated and are now remote in time. They occurred during one exchange with [the plaintiff] . . . . As such, they cannot sustain [the plaintiff's] hostile environment claim.").

Moreover, while the evidence indicates that Plaintiff overheard Dawsey and Barrett using offensive and derogatory language during conversations that occurred within their offices, these conversations were never directed at Plaintiff, and Plaintiff was never the subject of such

conversations. Instead, Plaintiff's deposition testimony indicates that during these conversations, Dawsey and Barrett would "often degrade their wives to each other" and would also "use derogatory words towards women officers." ECF No. 41-1 at 17. However, this evidence is insufficient to demonstrate that Plaintiff was subject to severe or pervasive harassment actionable under Title VII. *See Fairbrook Med. Clinic, P.A.*, 609 F.3d at 328-29 ("We have previously recognized that there is a difference between 'generalized' statements that pollute the work environment and 'personal gender-based remarks' that single out individuals for ridicule. Common experience teaches that the latter have a greater impact on their listeners and thus are more severe forms of harassment."); *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 545 (7th Cir. 2011) ("[T]he more remote or indirect the act claimed to create a hostile working environment, the more attenuated the inference that it had an effect on the terms and conditions of the plaintiff's workplace.").

Finally, with regard to the additional evidence highlighted within Plaintiff's objections, including evidence that Dawsey entered Plaintiff's office when she was not present and wrote notes on her calendar, such evidence indicates that Dawsey engaged in unprofessional, disrespectful, and occasionally physically destructive conduct. The Fourth Circuit has emphasized that Title VII is "not a general civility code." *Ziskie v. Mineta*, 547 F.3d 220, 228 (4th Cir. 2008) (citing *Oncale*, 523 U.S. at 81). Indeed, "Title VII was not designed to create a federal remedy for all offensive language and conduct in the workplace." *Hartsell v. Duplex Prods., Inc.*, 123 F.3d 766, 773 (4th Cir. 1997). In that regard, "profanity," "boorishness," or the "occasional off-color joke or comment" does not constitute conduct sufficient to give rise to a Title VII hostile work environment claim. *Ziskie*, 547 F.3d at 228. The court concludes that the conduct highlighted within Plaintiff's objections does not demonstrate conduct sufficiently severe or pervasive to be actionable under Title VII.

iii. *Whether There is Some Basis for Imposing Liability on the Employer*

Even assuming, *arguendo*, that Plaintiff has shown that the alleged conduct was sufficiently severe or pervasive to alter the conditions of Plaintiff's employment, Plaintiff need also show that some basis exists for imputing liability to Defendant, her employer.  "Where an employee has been harassed by a coworker, the employer may be liable in negligence . . . if it knew or should have known about the harassment and failed to take effective action to stop it." *EEOC v. Xerxes Corp.*, 639 F.3d 658, 669 (4th Cir. 2011) (internal quotations omitted); *Sunbelt Rentals, Inc.*, 521 F.3d at 319 ("Once the employer has notice, then it must respond with remedial action reasonably calculated to end the harassment.") (internal quotations omitted).  The Fourth Circuit has "not required that particular remedial responses be the most certainly effective that could be devised." *Mikels v. City of Durham*, 183 F.3d 323, 330 (4th Cir. 1999).  Instead, in determining whether a response is adequate, the Fourth Circuit has considered "the promptness of the employer's investigation when complaints are made, whether offending employees were counseled or disciplined for their actions, and whether the employer's response was actually effective." *Xerxes Corp.*, 639 F.3d at 669.  Within this inquiry, "the mere fact that harassment reoccurs in the workplace, either by the same offender or different offenders, does not, *ipso facto,* allow a jury to conclude that an employer's response was not reasonably calculated to end the harassment." *Id.*  Instead, "it is possible that an action that proves to be ineffective in stopping the harassment may nevertheless be found reasonably calculated to prevent future harassment and therefore adequate . . . as a matter of law." *Id.* at 670.

The evidence presented by Plaintiff, as the Magistrate Judge correctly observed, shows that Defendant was attentive to Plaintiff's concerns at all stages of her employment.  For example, when Plaintiff complained about the use of the women's restroom by male employees, Defendant

effectively resolved the issue by installing a lock on the women's bathroom and providing Plaintiff with the only key.  When Dawsey confronted Plaintiff in the office and called her a "bitch," Defendant permitted Plaintiff to leave work for the day.  ECF No. 41-5 at 3-4.  When addressing this incident in her "Sexual Harassment/Hostile Work Environment Complaint" filed internally, Plaintiff stated that following the interaction, "Ms. Barnwell did speak to Mr. Dawsey and everything calmed down for the most part."  *Id.* at 4.  Also, Defendant reviewed Plaintiff's internal complaint within a month of its filing, but found that the alleged circumstances did not constitute sexual harassment or hostile work environment.  ECF No. 41-6 at 2.

After the incident in which Dawsey kicked in his office door, Defendant required Dawsey to take a medical leave of absence.  While Plaintiff appears to have been dissatisfied with the length of such absence, Plaintiff's personal preferences are not relevant to the determination of whether liability should be imposed on the employer.  The relevant inquiry is whether Defendant's response was "reasonably calculated to prevent future harassment."  *See Xerxes Corp.*, 639 F.3d at 670.  Defendant reacted promptly following the incident and disciplined Dawsey for his actions by requiring him to take a medical leave of absence.  There is no indication that this remedial action was not sufficient to prevent any further harassment, as Plaintiff resigned before having any interaction with Dawsey after his return from medical leave.  Defendant's response was "reasonably calculated to prevent future harassment."  Accordingly, the court finds that Plaintiff has not shown any basis for imputing liability to Defendant.

Because the court finds that Plaintiff cannot satisfy the elements of a hostile work environment claim, which is a necessary predicate to establishing a hostile-environment constructive discharge claim, Plaintiff's hostile-environment constructive discharge claim necessarily fails.  *See*

*Helton v. Southland Racing Corp.*, 600 F.3d 954, 960 (8th Cir. 2010) (recognizing that because a plaintiff "failed to show that she was subjected to a hostile environment . . . it necessarily follows that she cannot show 'something more'" to sustain a claim for hostile-environment constructive discharge). A hostile-environment constructive discharge claim involves a more demanding showing with regard to the severity of the conduct, and the evidence presented by Plaintiff, taken in the light most favorable to Plaintiff, does not show such intolerable conduct. *See Spencer v. Wal–Mart Stores, Inc.*, 469 F.3d 311, 316 n.4 (3d Cir. 2006) (noting that "[a] hostile work environment will not always support a finding of constructive discharge" because proof of constructive discharge requires "a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment") (internal quotations omitted).

Defendant's motion for summary judgment is granted as to Plaintiff's Title VII hostile-environment constructive discharge claim.

b. *Disparate Treatment*

To the extent Plaintiff asserts a claim for disparate treatment based on gender, the court finds that Plaintiff has failed to establish a prima facie case of disparate treatment. Both parties concede that the first two elements of proof are not at issue, as Plaintiff (1) is a member of a protected class, and (2) was performing her job duties satisfactorily at the time of her resignation. However, the court finds that Plaintiff has failed to establish the existence of an adverse employment action, a necessary element of a disparate treatment claim. A constructive discharge theory, as advanced by Plaintiff, can constitute an adverse employment action for the purposes of a Title VII disparate treatment claim. However, for the reasons previously discussed, Plaintiff has not provided sufficient evidence of a hostile work environment, much less of an environment so intolerable as to warrant

27

her resignation.  The court finds that any disparate treatment claim advanced by Plaintiff is without merit.[2]

To the extent that Plaintiff's Title VII claim for gender discrimination is one of disparate treatment, Defendant's motion for summary judgment is granted.

**B.  *Retaliation***

Defendant moves for summary judgment on Plaintiff's Title VII claim for retaliation. Plaintiff did not oppose this part of Defendant's motion for summary judgment and did not file objections to the portion of the Report and Recommendation addressing the retaliation claim.

Generally, Title VII prohibits an employer from discriminating or retaliating against an employee because the employee has "opposed any practice made an unlawful employment practice" under Title VII or "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII.  *See* 42 U.S.C. § 2000e–3(a).  To establish a prima facie case, a plaintiff must show: "(1) that she engaged in a protected activity; (2) the employer acted adversely against her; and (3) there was a causal connection between the protected activity and the asserted adverse action."  *Ziskie*, 547 F.3d at 229.  The causal element may be satisfied by close temporal proximity between the protected activity and the adverse employment action.  *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001).  However, "[i]n cases

---

[2]    With regard to the fourth element, different treatment from similarly situated employees outside the protected class, the court notes that Plaintiff contends that "proof that she was treated less favorably than her male co-workers is clearly demonstrated by the [Defendant's] on-going preferential treatment of Dawsey over Plaintiff, even though Dawsey was a disruptive, destructive bully."  ECF No. 41 at 19.  However, because the court finds that Plaintiff has not provided sufficient evidence to satisfy the third element, adverse employment action, the court need not address Plaintiff's arguments regarding the fourth element.

where temporal proximity between protected activity and allegedly retaliatory conduct is missing, courts may look to the intervening period for other evidence of retaliatory animus." *Lettieri v. Equant, Inc.*, 478 F.3d 640, 650 (4th Cir. 2007) (internal quotations omitted).

The Magistrate Judge determined that Plaintiff failed to establish a prima facie case of retaliation because she did not put forth sufficient evidence that Defendant acted adversely against Plaintiff . ECF No. 44 at 13.  Further, even assuming Plaintiff had shown an adverse employment action, the Magistrate Judge found that Plaintiff did not provide sufficient evidence to show the necessary causal connection between Plaintiff's protected activity and Defendant's adverse employment action.  *Id.*  As such, the Magistrate Judge recommended granting Defendant's motion for summary judgment as to Plaintiff's Title VII claim for retaliation.  *Id.*

In the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must "only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 315 (4th Cir. 2005).  After carefully reviewing the record and the applicable law, the court agrees with the Magistrate Judge's findings.  Defendant's motion for summary judgment is granted as to Plaintiff's claim for retaliation under Title VII.

### C.  Section 1983

Defendant moves for summary judgment as to Plaintiff's claim under 42 U.S.C. § 1983 for alleged violations of Plaintiff's rights under the equal protection clause of the Fourteenth Amendment.  Plaintiff does not offer objections to this portion of the Magistrate Judge's Report and Recommendation.

The Fourth Circuit has explained that "the equal protection clause confers on a public employee a federal constitutional right to be free from gender discrimination." *Beardsley v. Webb*, 30 F.3d 524, 530–31 (4th Cir.1994). Further, "sexual harassment has long been recognized to be a type of gender discrimination." *Id.* The elements necessary to establish a prima facie case of discrimination under Title VII are the same elements necessary to establish a prima facie case of discrimination under § 1983. *Gairola v. Virginia Dep't. of Gen. Servs.*, 753 F.2d 1281, 1285 (4th Cir. 1985). In that regard, because the Magistrate Judge recommended granting Defendant's motion for summary judgment as to Plaintiff's Title VII claims, she also recommended granting Defendant's motion for summary judgment as to Plaintiff's § 1983 claim.

In the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must "only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Diamond*, 416 F.3d at 315. After carefully reviewing the record and the applicable law, the court agrees with the Magistrate Judge's findings. Defendant's motion for summary judgment is granted as to Plaintiff's claim under 42 U.S.C. § 1983.

**D.  *State Law Claims***

Having granted summary judgment in favor of Defendant as to all of Plaintiff's federal claims, the court declines to exercise supplemental jurisdiction over Plaintiff's state law claims for wrongful discharge/breach of contract and negligent supervision. The court remands the case to state court pursuant to 28 U.S.C. § 1367(c)(3). *See* 28 U.S.C. § 1367(c)(3) (providing that a district court may decline to exercise supplemental jurisdiction over a claim if "the district court has dismissed all claims over which it has original jurisdiction").

## IV.  CONCLUSION

For the reasons stated herein, the court concurs in the recommendation of the Magistrate Judge that Defendant's Motion for Summary Judgment should be granted.  Accordingly, Defendant's motion for summary judgment, ECF No. 37, is **GRANTED**.  Plaintiff's Title VII claims and Plaintiff's 42 U.S.C. § 1983 claim are **DISMISSED**.  Plaintiff's remaining state law claims are **REMANDED** to state court.

**IT IS SO ORDERED.**

<u>s/ Margaret B. Seymour</u>
Margaret B. Seymour
Senior United States District Judge

Columbia, South Carolina
September 20, 2013

31